Stacy Scheff #028364
LAW OFFICE OF STACY SCHEFF
P.O. Box 40611
Tucson, AZ 85717
Ph: (520) 471-8333 – Fax: (520) 300-8033
Email: Stacy.Scheff@gmail.com
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Javon Stephon Harris  Plaintiff,  v.  Centurion, et. al.  Defendants. | Case No. 2:21-cv-00828  FIRST AMENDED COMPLAINT |

A. JURISDICTION

1. This Court has jurisdiction over this action pursuant to 42 U.S.C. §1983

2. Institution/city where violation occurred: Eyman Complex Unit SMU I, Florence, AZ

B. DEFENDANTS

1. David Shinn, Director of Arizona Department of Corrections is named in his official capacity for purposes of injunctive relief; writs of *Habeas Corpus Ad Testificandum;* and failure to train and supervise ADC staff and contractor Centurion in the administration of transgender prisoner healthcare. As is the Director of The Arizona Department of Corrections, he the lead policy-maker for that agency.

2. Centurion Health, Inc.  Centurion is the private company contracted by Director Shinn to provide medical and mental healthcare to Arizona prisoners, starting on July 1, 2019. They are sued here because they have a policy, practice, and custom of denying necessary

treatments in order to save money, intentionally withholding necessary treatment as punishment, and being prejudiced against transgender prisoners.

3. Wesley Luffman is named in his individual capacity. At all times relevant he was employed by Centurion as a Licensed Psychology Associate under contract to the Arizona Department of Corrections. Defendant Luffman withheld HRT from Plaintiff as punishment and consistently mis-gendered Plaintiff, in keeping with Centurion's policies, practices, and customs.

4. Brett Leifson is named in his individual capacity. At all times relevant he was employed by Centurion as a Mental Health (midlevel) Associate under contract to the ADC. Defendant Leifson requested that the HRT be discontinued without justification, in keeping with Centurion's policies, practices, and customs.

5. Jeffrey Baum is named in his individual capacity. At all time relevant he was employed by Centurion as a Psychology Associate under contract to the Arizona Department of Corrections.  Defendant Baum withheld HRT from Plaintiff as punishment and consistently mis-gendered Plaintiff, in keeping with Centurion's policies, practices, and customs.

6. Erin Erwin-Mahilos is named in her individual capacity. At all times relevant she was employed by Centurion as a Psychologist under contract to the Arizona Department of Corrections. Defendant Erwin-Mahilos withheld HRT from Plaintiff as punishment and consistently mis-gendered Plaintiff, in keeping with Centurion's policies, practices, and customs.

**FACTS**

1. Plaintiff is a male-to-female transgender individual.

2. Plaintiff has been a prisoner at Arizona State Prison Complex ("ASPC") Eyman, SMU I at all relevant times.

3. "Gender dysphoria" is listed in Plaintiff's medical records as having an "onset date" of February 21, 2018. (0073)

4. Hormone replacement therapy ("HRT") is a common treatment for gender dysphoria.

5. Plaintiff did not receive HRT until June of 2019.  At that time, she received Estradiol, an estrogen therapy widely recognized as medically appropriate for gender dysphoria treatment.

6. On July 1, 2019, Defendant Centurion took over the contract for prisoner medical and mental healthcare.

7. On the same day, Plaintiff's estradiol was abruptly discontinued.

8. Plaintiff only received HRT for under a month.

9. Estradiol is a long-term hormone therapy that requires regular doses and monitoring.  WPATH standards call for the first monitoring for adverse effects after 3 months of continuous HRT.

10. On information and belief, Centurion discontinued many prisoners' medications when they assumed control as a matter of policy.

11. On or about July 1, 2019 Plaintiff was seen by Psych Associate Wesley Luffman. (0354)  The subjective notes from that encounter state:

> Pt seen for 2nd wfu contact. He [sic] was offered to be pulled out of his [sic] cell in a confidential setting and he [sic] refused. He [sic] was seen at his [sic] cell front. He [sic] was advised that this writer was under the supervision of a licensed psychologist. He [sic] denies SI/HI/AVH. The pt started the conversation by berating this writer, cursing and insulting them. The pt continued this and appeared to need to get out some frustration about having their hormone replacement therapy medications discontinued by medical due to his [sic] excessive erratic and aggressive behavior. The pt continues to present as angry throughout most of the session but was eventually redirected to a more respectful fashion of relating. He [sic] eventually was calm and able to identify what he [sic] needs to do to get back on HRT. However, he [sic] states, "I don't have to do nothing because y'all don't know know [sic] what you getting into. I gots the diagnosis. You haves to gives me the meds." Pt. Is not presenting as DTS/DTO, however he [sic] is very crude and irritable.

12. On July 3, 2019 defendant Leifson informed Ms. Harris that "absent HRT, psychiatric distress may be better assessed absent influence of hormonal imbalance". (0346)

13. On July 9, 2019 Defendant Luffman indicated that Ms. Harris would be placed back on HRT after she "showed an extended period of stability so that he [sic] can prove that he [sic] is ready to restart HRT medications" (0312) Ms. Harris and Luffman then negotiated a one month period of good behavior to earn back HRT therapy.

14. On July 19, 2019 Defendant Erwin-Mahilos advised Ms. Harris that "he [sic] would be able to start taking hormones if he [sic] stayed off watch and did not cause an Incident Command System ("ICS") [a.k.a. 'emergency'] for the next three months. (0269)

15. The next day Defendant Baum advised Ms. Harris "medical provider stopped his [sic] hormone therapy and he [sic] was expected to show a reasonable period of stability, approximately 3-4 months and then his [sic] medication may be resumed" (0302)

16. On July 30, 2019 after a conversation with Defendant Erwin-Mahilos with "medical provider and psychologist present", Plaintiff inserted a paper clip into her urethra "because he [sic] wanted to talk to the provider about getting back on the hormones" (0250)

17. After another meeting with Defendant Erwin-Mahilos with "providers present" it was decided to place Ms. Harris back on hormones along with an antipsychotic medication." (0250)

18. Plaintiff was hospitalized for three days at Mountain Vista Medical Center having had surgery to remove the object from her urethra.

19. Mountain Vista Medical Center records show diagnoses of "Bipolar I disorder with depression" and "Gender dysphoria". (0361)

20. Mountain Vista Medical Center records show that Plaintiff was prescribed estradiol at that time. (0363-4)  This was the second time that the records show Plaintiff receiving estradiol.

21. Shortly after, Plaintiff's estradiol was discontinued.

22. On August 6, 2019, Plaintiff was seen by psychologist Erin Erwin-Mahlios. The subjective notes say:

> The patient was seen while on a continuous mental health watch.  He [sic] was seen in a private and confidential setting.

> He [sic] denied SI/HI/AVH. He [sic] said that he [sic] wants to have his [sic] hormones back. He could not talk about anything else but his [sic] hormones. He [sic] stated that since he [sic] has been taking the Risperdal that "he [sic] is shot down there (meaning his [sic] privates)". He [sic] could not move from not have big breasts, the hormones, or his [sic] penis. Finally TW said that she would see what she could do to convince the powers that be that he [sic] be granted his [sic] hormones if only so that he [sic] could concentrate on something else (also, his [sic] behavior has not been more stable since his [sic] hormones were removed and that was the reason for stopping the hormones). Magically, he [sic] was able to turn his [sic] attention to something else… [0214]

23. On August 15, 2019, Plaintiff's prescription for Estradiol, was renewed, with the prescription expiring on February 10, 2020. This was the third time the records show Plaintiff receiving estradiol.

24. Plaintiff's estradiol therapy was not properly administered or monitored in keeping with WPATH standards, in order to prevent self-harm.

25. On information and belief it was the improper administration and monitoring of hormone therapy that led Plaintiff to self-harm.

26. On August 30, 2019, only two-weeks after being resumed on estradiol, Plaintiff placed three, V-shaped paper clips and a plastic fork handle into her urethra (0132).

27. On information and belief, Centurion staff were aware of Plaintiff's self-harm.

28. On August 31, 2019 Ms. Harris still had the objects inside her urethra. (0127)

29. On September 1, 2019 despite objects remaining inside her urethra, a mental health registered nurse described Plaintiff as "able to verbalize wants and needs appropriately, neat/clean appearance, no hallucinations/delusions noted during

6

encounter, speaks quietly." (0122) On information and belief, the unknown nurse did not actually examine or speak to Plaintiff.

30. On September 3, 2019 Ms. Harris still had the same articles inside her urethra. (0112)

31. On September 4, 2019, five days after having self-harmed, Ms. Harris was returned to the hospital to have the objects removed from her penis. (0108)

32. The time that Plaintiff was left with foreign objects in her penis caused her significant pain.

33. On September 12, 2019, mental health staff Brett Leifson requested that the medical provider discontinue Plaintiff's estradiol *for the third time* because they suspected the medication to be exacerbating factors in mood and psychotic presentation. (0072-73)

34. On the same day, Centurion Nurse Practitioner Kendra Avant-Ortiz concurred. (0075)

35. On or about September 13, 2019, did not receive estradiol in her medications.

36. About twenty minutes after missing the HRT, Plaintiff stated she was hearing voices and seeing things and felt suicidal.

37. Plaintiff stuffed a pencil and milk carton into her penis.

38. The same day, Plaintiff also had swallowed two batteries, in an attempt to commit suicide.

39. Despite knowing about these serious injuries, it was not until two hours later, when Nurse Shaw had finished delivering meds, that Plaintiff was taken to the

health unit, where Plaintiff couldn't urinate and was in pain and bleeding from the penis.

40. After being brought to health unit, Plaintiff was not immediately examined.

41. Johnson and Luffman placed Plaintiff on a suicide watch rather than ordering or giving medical treatment for ingested batteries and an obstructed urethra.

42. Two emergency surgeries were needed and pain meds were issued.

43. Plaintiff suffered an ulcer.

44. On information and belief, Defendants Luffman, Leifson, Baum, and Erwin-Mahilos were aware that starting and stopping HRT would cause Plaintiff to become suicidal.

## COUNT I – 42 U.S.C. §1983
## MEDICAL DELIBERATE INDIFFERENCE
**(Individual Defendants: Luffman, Leifson, Baum, and Erwin-Mahilos)**

45. The standard of care for transgender health comes from The World Professional Association for Transgender Health ("WPATH").[1]

46. The WPATH standards for surveillance of HRT are:

- Monitor for feminizing and adverse effects every 3 months for the first year, then every 6–12 months

- Obtain baseline hematocrit and lipid profile and monitor at follow-up visits

---

[1] https://www.wpath.org/; Braver, Samantha, Circuit Court Dysphoria: The Status of Gender Confirmation Surgery Requests by Incarcerated Transgender Individuals (February 7, 2020). 120 Colum. L. Rev (2020, Forthcoming), Available at SSRN: https://ssrn.com/abstract=3534362 or http://dx.doi.org/10.2139/ssrn.3534362

- Obtain baseline bone mineral density if a patient is at risk for osteoporosis; routine screening after age 60, or earlier if sex hormone levels consistently low
- Obtain prolactin at baseline, at 12 months after initiation of treatment, biennially thereafter
- Monitor serum testosterone during the first 6 months until levels are <55 ng/dL
- Monitor serum estradiol at follow-up visits; target 100–200 pg/mL[2]

47. The onset of effects from hormone treatment may take months to occur with the maximum effect taking years to achieve.[3]

48. Abruptly stopping hormones may lead to an increased risk of suicide.[4]

49. All defendants were aware, at all relevant times, that transgender people like Plaintiff are disproportionately at risk: as the targets of sexual and physical assault; at risk for gender dysphoria - a severe psychiatric condition that causes anxiety and depression; and also at risk from self-harm and suicide.

50. ADCRR Department Order 810 governs "Management of LGBTI Inmates". Subsection 2.0 governs "Transgender and Intersex Inmates".

51. DO 810 (2.1.1) states: "Services shall include the potential to prescribe hormones if determined medically necessary, but shall not include gender reassignment surgery."

---

[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5182227/ Accessed 09/29/2021

[3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6007530/ Accessed 09/29/2021

[4] https://www.sciencedirect.com/science/article/pii/S2214623715000630#bib0035 Accessed 09/29/2021

52. On information and belief, Defendants are motivated by an improper bias against transgender people.

53. Defendants have instructed their staff in, and staff have acted pursuant to, a policy, practice, and custom of improperly administering hormone therapy for transgender prisoners.

54. On information and belief, the improper hormone therapy administration was done intentionally to punish and manipulate Plaintiff, and without medical justification.

55. The standard of care with respect to prescribing hormone replacement therapy ("HRT") for transgender people are: 1. persistent, well documented gender dysphoria; 2. Capacity to make a fully informed decision and to consent to treatment; 3. Age of majority; 4. If significant medical of mental health concerns are present, they must be reasonably well controlled.

56. Per WPATH "The presence of co-existing mental health concerns does not necessarily preclude access to feminizing hormones; rather, these concerns need to be managed prior to or concurrent with treatment of gender dysphoria."

57. Manipulation of HRT for disciplinary reasons violates the standard of care.

**COUNT II – 42 U.S.C. §1983**
**FAILURE TO TRAIN AND SUPERVISE STAFF AND CONTRACTORS IN TRANSGENDER MEDICAL AND MENTAL HEALTHCARE**
**(Supervisory Defendants: Centurion Health & David Shinn)**

58. Plaintiff incorporates the previous paragraphs as though fully set forth here.

59. Neither Defendant Shinn nor the previous Director, Charles Ryan, updated DO

810 to include the WPATH standards of care.

60. On information and belief, Centurion staff were, and are, aware of the standards of care for transgender healthcare, and chose to ignore them with regard to Plaintiff.

61. On information and belief this willful and ongoing ignorance of the standards of care for transgender healthcare is an unspoken custom and policy of both Director Shinn and the healthcare contractor chosen and sanctioned by the ADC: Defendant Centurion Health.

62. As a direct and proximate result of Defendant Shinn and contractor Centurion continually and willfully ignoring the standards of care for transgender healthcare, Plaintiff was injured.

WHEREFORE, Plaintiff prays for the following:

1. Compensatory and punitive damages in an amount to be decided by the trier of fact.
2. Attorney fees and costs associated with this action.
3. Any other relief the Court deems just and proper.

DATED this 29th day of September, 2021.

_S. Scheff_

Stacy Scheff
Attorney for Plaintiff Javon "Shawnee" Harris